SO ORDERED: July 09, 2009.

_____
Anthony J. Metz III
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| IN RE: ) | |
| ) | |
| DAVID GARY CUTLER ) | CASE NO. 08-15568-AJM-7A |
| KELLY SUE CUTLER ) | |
| ) | |
| Debtors ) | |

**ORDER DENYING UST'S MOTION TO DISMISS
PURSUANT TO 11 U.S.C. §§707(b)(1),(2) and (3)**

*Background*

The Debtors filed this chapter 7 case on December 15, 2008. According to their Chapter 7 Statement of Current Monthly Income and Means Test Calculation (B22A), the Debtors were above median income debtors. The B22A indicated that the presumption of abuse did not arise, primarily because the Debtors' claimed a $5700.98 deduction for mortgage payments on their residence which they intended to surrender. The Debtors' Schedules I and J showed monthly income of $3447.21 and monthly

1

expenses of $7708.66 for a monthly shortfall of $4261.45.

The United States Trustee ("UST") moved to dismiss the case under §§707(b)(1), (2) and (3) (the "UST's Motion"). Under §707(b)(2), the UST challenged the mortgage deduction.[1] Under §707(b)(3), the UST claimed that the Debtors' income was greatly understated because, as of the date of the hearing on the UST's Motion, Mr. Cutler had obtained permanent employment with an annual salary of $125,000. Hearing on the UST's Motion was held on June 8, 2009 wherein the Debtors appeared by counsel Gary Hostetler and Nicolette Mendenhall; the UST appeared by counsel Jeannette Eisan Hinshaw. At the conclusion of the hearing, the UST requested additional time to file a supplemental brief discussing the issue of to what degree the "totality of the circumstances" test under §707(b)(3) should include the Debtors' post petition financial circumstances. That supplemental brief was filed on June 17, 2009.

## *Discussion*

### *§707(b)(2)(A)(iii) - Allowance of Mortgage Deduction*

Under the means test, it is presumed that the granting of relief would be an abuse of the chapter 7 provisions if a chapter 7 consumer debtor's "monthly disposable income" exceeds $182.50. 11 U.S.C. §707(b)(2)(A)(i). The means test allows above median income debtors to deduct certain expenses in computing their "monthly disposable income". Among such deductible expenses are the "Average Monthly Payments" found on Line 42 of B22, which are calculated as the sum of "the total of all

---

[1] The UST also challenged other deductions, but even if the Court ruled in the UST's favor on those challenges, the presumption of abuse still would not arise unless the Court disallowed the mortgage deduction on Line 42. Thus, the outcome of the UST's challenge to the mortgage deduction is pivotal.

2

amounts *scheduled as contractually due* to secured creditors in each month of the 60 months following the date of the petition...divided by 60". 11 U.S.C. §707(b)(2)(A)(iii)(I). (Italics added). The Debtors here included in their "Average Monthly Payments" their first and second mortgage payments on their residence in the aggregate of $5700.98. This large deduction, in turn, resulted in a negative "monthly disposable income" and thus, the "presumption of abuse" did not arise.

The UST urges disallowance of the deduction because the means test is "forward looking" and contemplates a deduction only for those mortgage payments that actually will be paid in the future. Although case law can be found on both sides of this issue, a clear majority considering the deduction in the chapter 7 context has rejected this argument, citing that the means test is a "snapshot" of the debtor's financial circumstances as of the petition date and the deduction should be allowed if the debtor was contractually obligated to make the payments as of that date. The "plain meaning" of the language found in §707(b)(2)(A)(iii)(I) is read to allow the deduction because such amounts are "contractually due" - they are amounts the debtor is contractually bound to make as of the petition date - and, "nothing the debtor does or does not do changes the fact that the scheduled payments remain contractually due". *In re Nockerts*, 357 B.R. 497, 500 (Bankr. E.D. Wis. 2006)(citations omitted). A bankruptcy court in this Circuit reasoned:

> The plain language of §707(b)(2)(A)(iii) requires the debtor to deduct the amount due under her contracts for secured debt regardless of whether she intends to redeem, reaffirm or surrender the property. If Congress had intended otherwise, it could easily have said so, excluding secured debt where the debtor has stated an intention to surrender the collateral. Or Congress could have specified that only payments the debtor actually intended to make post petition should be deducted from income. But Congress did neither. Congress' choice of language

3

shows a clear intent not to impose any such limit on debtors.

*In re Randle,* 358 B.R. 360, 363 (Bankr. N. D. Ill. 2006) aff'd by *In re Randle*, 2007 WL 2668727 (N. D. Ill"). *See also, In re Rudler*, 388 B.R. 433 (1st Cir. BAP 2008)  *In re Goble,* 401 B.R. 261 (Bankr.S. D. Ohio 2009); *In re Ralston,* 400 B.R. 854 (Bankr. M.D. Fla. 2009); *In re Guerriero,* 383 B.R. 841 (Bankr. D. Mass. 2008); *In re Makres,* 380 B.R. 30 (Bankr. N. D. Okla. 2007).  Unpublished cases allowing the deduction include *In re Crawley*, 2009 WL 902359 (Bankr. E. D. Va.) and *In re Castillo,* 2008 WL 4544476 (Bankr. S. D. Fla.).  [2]  But see, *In re Burden*, 380 B.R. 194 (Bankr. W. D. Mo. 2007); *In re Skaggs*, 349 B.R. 594 (Bankr. E. D. Mo. 2006).

The UST argues that the words "scheduled as" that precede "contractually due" should be taken to mean that the deduction is allowed only if the debt is scheduled as a secured debt that the debtor will pay in each of the 60 months after the bankruptcy filing.  This argument, too, has been soundly rejected in that  *"scheduled as contractually due"* does not refer to the bankruptcy schedules.  Rather, "there is no bankruptcy schedule that requires the debtor to list 'all amounts contractually due to secured creditors in each month of the 60 months following the date of the petition'.  So there is no bankruptcy schedule to which §707(b)(2)(A)(iii) could refer ".  *Randle*, 358

---

[2] Judge James K. Coachys of this District has allowed the deduction in the chapter 13 context and held that the chapter 13 debtor was entitled to include his mortgage payment in calculating disposable income for §1325(b)(3) purposes. See, *In re Turner*, 384 B.R. 537 (Bankr. S. D. Ind. 2008).  *Turner* is on direct appeal before the Seventh Circuit Court of Appeals.  Courts are more closely divided as to whether the deduction should be allowed in the chapter 13 context, but it appears that the majority allows the deduction.  Besides *Turner*, see, *In re Thomas*, 395 B.R. 914 (6th Cir. BAP 2008); *In re Marshall*, 2009WL 1652471(Bankr. D. Mass); *In re Varner*, 2009 WL 1468707 (Bankr. D. Idaho); *In re Slater*, 2009 WL 1220270 (Bankr. N.D. Ill.).  For cases that disallow the deduction in the chapter 13 context, see, *In re Rahman*, 400 B.R. 362 (Bankr. E. D. N. Y. 2009); *In re Marchionna*, 393 B.R. 512 (Bankr. N. D. Ohio 2008); *In re Gonzalez*, 388 B.R. 292 (Bankr. S. D. Tex. 2008); *In re Romero*, 2009 WL 994944(Bankr. N. D. Ill.)(disallowed deduction for surrendered second residence).

4

B.R. at 365.

In addition to the "total of all amounts scheduled as contractually due" as set forth in §707(b)(2)(A)(iii)(I), subpart II of that section allows "any additional payments to secured creditors necessary for the debtor, in filing a plan under chapter 13 of this title, to maintain possession of the debtor's primary residence..." to be included in computing a debtor's "average monthly payments". The UST points to subpart (II) – subpart I's "conjunctive partner" - in arguing that the use of the word "additional" in subpart II makes it clear that it is an extension of subpart I and therefore subpart I refers to payments that are to be actually made. However, subpart II merely allows a deduction for payments needed to cure any pre petition arrearage on a residence. The *Burden* court disallowed the mortgage deduction in subpart I based on the "additional" language of subpart II primarily because it would be inconsistent to allow a chapter 13 debt to deduct a mortgage payment on a surrendered residence but to deny the same chapter 13 debtor a deduction for the pre petition arrearage on the mortgage. However, "[w]hile these considerations may be relevant in the context of an objection to confirmation of a chapter 13 plan, they are not germane to the calculation of the means test to determine whether it is presumptively abusive for a debtor to receive chapter 7 relief". *Castillo*, at *3.

Finally, the UST argues that allowing the deduction for mortgage payments on a surrendered residence is contrary to the Congressional intent in enacting BAPCPA, which was to require debtors to "repay creditors the maximum they can afford". *UST brief in Support of Motion to Dismiss, p. 8.* Repayment to creditors may have been one of the goals behind BAPCPA , but Congress' intent in creating the means test under

5

§707(b)(2) was to eliminate judicial discretion and replace it with a "mechanical" formula to determine abuse in chapter 7 cases. *Rudler*, 388 B.R. at 439; *Randle,* 358 B.R. at 363 ("Congress' intent to use a standardized or mechanical test and avoid reliance on individualized information as much as possible is demonstrated throughout §707(b)(2)"); *Guerriero*, 383 B.R. at 847 ("[t]he deduction of secured payments due at the time of the petition filing – even if the debtor intends to eventually surrender the property – is consistent with the mechanical, discretion-void nature of the means test"). Applying the mechanical formula, the Court has determined that the Debtors' line 42 deduction for their mortgage payments should be allowed. Besides, a debtor's ability to deduct a mortgage payment which he is contractually obligated to pay on his bankruptcy petition date should be no more suspect than a debtor's ability to deduct transportation ownership expenses for a car he owns free and clear as of the petition date. See, *In re Ross-Tousey*, 549 F.3d 1148 (7th Cir. 2008). The Court will not address the other challenges to the Debtors' B22 as, even if the UST were successful, there would not be sufficient disposable income for the presumption of abuse to arise. Because the presumption does not arise, there is no need to address the Debtors' contention that the presumption is rebutted by special circumstances.

### *§707(b)(3)(B) - "The Totality of the Circumstances"*

The UST in the alternative has moved to dismiss the case under the "totality of the circumstances" test found in §707(b)(3)(B). The "totality of the circumstances" test has its origins under pre-BAPCPA law, even though pre- BAPCPA §707(b) did not refer to "totality of the circumstances". Pre-BAPCPA §707(b) did allow for a chapter 7 case

6

to be dismissed where the granting of relief would be a *substantial* abuse of the provisions of chapter 7, and the circuits adopted various "tests" in determining "substantial abuse". However, the Fourth Circuit's "totality of the circumstances" test that evolved under pre-BAPCPA law "was adopted by name in BAPCPA §707(b)(3)(B), suggesting that something other than an ability to pay is required to succeed on a motion to dismiss under this section". *Nockerts*, 357 B. R. at 505-06.

### *Judicial Discretion*

Unlike the rigid, mechanical "means test", the Court has discretion to consider and determine a debtor's actual financial condition under this section. Under the "totality of the circumstances" test , a debtor's ability to pay may be the most relevant factor, but the Court must also consider : (1) whether the bankruptcy petition was filed because of sudden illness, calamity, disability or unemployment; (2) whether the debtor incurred cash advances and made consumer purchases far in excess of his ability to pay; (3) whether the debtor's proposed family budget is excessive or unreasonable; and (4) whether the debtor's schedules and statement of current income and expenses reasonably and accurately reflect the true financial condition; *In re Green*, 934 F.2d 568, 572 (4th Cir. 1991). [3]

### *Application of the First Two Green Factors*

This chapter 7 bankruptcy was filed because the Debtors – a historically financially successful couple who in 2006 earned a combined annual salary of nearly $200,000 - both lost their jobs in 2008 within months of each other. In 1999, the

---

[3] The fifth *Green* factor, whether the petition was filed in good faith, is now found in §707(b)(3)(A).

Debtors were financially able to purchase a $510,000 five bedroom house which was valued at $700,000 as of the petition date. In 2007, Mr. Cutler earned $142,000 in the plastics packaging industry and Mrs. Cutler was employed by a marketing company. Despite their healthy income, the Debtors in 2007 realized they were living beyond their means. In a self-motivated attempt to reduce their credit card debt, the Debtors withdrew a little over $134,000 from Mr. Cutler's 401(k) retirement account. Mrs. Cutler lost her marketing job in spring of 2008 and Mr. Cutler lost his a few months later in July. Mrs. Cutler found employment in August, 2008 as a library media manager in the Carmel Clay school system but had collected unemployment compensation in the interim. Mr. Cutler found employment as a consultant on a temporary basis in November, 2008, but by then the Debtors had already engaged in significant belt tightening as their only income had been Mrs. Cutler's library income and Mr. Cutler's unemployment compensation. For example, the Debtors attempted to negotiate "interest only" payments to their mortgage companies, but were told (unbelievably) that such was not possible until the Debtors failed to make a few months' payments. Nor did an explanatory letter to the lenders convince them to temporarily convert the payments to "interest only". The Debtors ultimately failed to make their payments, given Mr. Cutler's lack of success in the job market and Mrs. Cutler's limited library income. The Debtors also fell behind on their credit card payments, and, as a result, some credit card companies increased their interest rates to as much as 30%. The Cutlers' children were placed on food assistance programs at their respective schools.

      The Debtors' withdrawal from Mr. Cutler's 401(K) retirement account resulted in significant tax liabilities in 2007 and 2008. To tackle this debt, the Debtors refinanced

8

both of their cars. In September and November, 2008, Mr. Cutler withdrew an additional $13,813.40 from his 401(k) retirement account in order to provide for living expenses. Mr. Cutler's temporary consulting job obtained in November, 2008, did not result in payment until late December, 2008, and thus, the Debtors' dire financial straits prompted them to file their chapter 7 case on December 15, 2008.

It is obvious that the Debtors filed this chapter 7 case because of their unexpected and almost-simultaneous loss of jobs and not because they continued to live beyond their means when their financial difficulties became apparent. While they were earning a large salary in 2007, the Debtors took significant steps in reducing their debt. Once they became unemployed and/or underemployed, the Debtors, in this Court's opinion, took extraordinary steps to deal with their financial circumstances by withdrawing funds from retirement accounts, attempting to negotiate with mortgage lenders, and refinancing their vehicles. Such are not the acts of debtors who incur cash advances and make consumer purchases far in excess of their ability to pay. Thus, the first two *Green* factors fall decidedly in the Debtors' favor.

### *The Debtors' Schedule I Income and Schedule J Expenses and Consideration of Post Petition Events*

The Debtors' financial picture has improved since the chapter 7 filing. Mr. Cutler's temporary consulting job obtained in November, 2008 resulted in a $10,000 payment over three installments, the first of which was paid in late December, 2008. $8,000 of the $10,000 went to pay down the tax debt. In February, 2009, Mr. Cutler obtained another temporary consulting job, with identical payment terms. From this income the Debtors moved from their five bedroom residence to a rental house, retired

9

the tax debt, continued to pay large COBRA monthly health insurance premiums exceeding $1000 and paid $2,000 for Mrs. Cutler's uninsured post petition medical care related to her cancer diagnosis. This second temporary consulting job ended in April, 2009 and Mr. Cutler filed for unemployment compensation. On May 1, 2009, Mrs. Cutler was informed that her library media position had been eliminated and that her employment would be terminated as of June 1, 2009. She has again filed for unemployment compensation. On May 18, 2009, Mr. Cutler obtained permanent employment and received his first paycheck on June 4, 2009. His annual salary in this new position is $125,000.

It is this post petition improvement in the Debtors' financial condition upon which the UST bases its motion to dismiss under §707(b)(3). Where the presumption of abuse does not arise under the means test, it is the UST that bears the burden of proving abuse under §707(b)(3). *Goble*, 401 B.R. at 274: *In re Durczynski*, 405 B.R. 880, 883 (Bankr. N. D. Ohio 2009); *In re Ansar*, 383 B.R 344, 348 (Bankr. D. Minn. 2008). The UST here attempts to prove abuse by showing understated income and excessive expenses on the Debtors' Schedules I and J filed on the petition date.

Schedule I shows monthly gross incomes of $0 and $2174.25 for Mr and Mrs. Cutler respectively. As of the petition date, Mr. Cutler had not yet been paid for his temporary consulting job and Mrs. Cutler was still employed as a library media manager, so Schedule I as of the petition date was accurate. However, the UST argues that Mr. Cutler's post petition salary should be considered. Estimating that monthly salary to be $10,000, the UST after subtracting an estimated $2,555 for payroll deductions, arrives at a combined monthly income of $9,383.00.

As to Schedule J, the UST argues that the expenses claimed by the Debtors on Schedule J for rent ($2000), utilities ($975) and transportation and auto insurance ($695.16) should be reduced to $1574.00, $497.00 and $366.00 respectively, based on IRS standards, resulting in reduced monthly expenses of $6475 and monthly net income of $2908 ($9373 minus $6475.00).  The difficulty in substituting IRS standard figures for certain Schedule J expenses is that such an approach fails to consider whether the actual expenses scheduled are reasonable in the context of the Debtors' current situation.  Mechanical formulaic IRS standards are applied under §707(b)(2)'s means test but the very purpose of §707(b)(3)(B)'s "totality of the circumstances" inquiry was to depart from formula.  Instead, a debtor's actual financial condition is to be considered, otherwise, §707(b)(3)(B) in many cases would be a rehash of the means test and rendered meaningless.

The UST, by admission into evidence of advertisements for rental homes, contends that the Debtors' $2000 rental expense is excessive.  Mr. Cutler testified that out of desire not to "traumatize" their children, the Debtors opted to look for housing within the same school district and found a home in the same area where their previous home had been located.  Because they were familiar with the owners, the Debtors were able to "work something out" with them and the size of the rental home allows Mr. Cutler to work from home.  Although a $2000 monthly rental fee may at first blush appear excessive, the Court has no credible evidence before it to suggest that the Debtors could rent a comparable home for far less in the same school district.  The Debtors' desire to remain in the same school district for the sake of the children is well taken.  Had Mr. Cutler opted to rent an office to conduct his business, office rental

11

coupled with the house rental – even at the $1574.00 rate suggested by the UST – surely would have exceeded $2000.00.  The Court does not believe, under these circumstances, that the Debtors' rental expense is excessive or unreasonable.

Furthermore, there was no credible evidence presented to suggest that the Debtors' utility expenses were excessive.  Given the fact that Mr. Cutler works out of the home, it is feasible that the Debtors have higher than average telephone, computer and cell phone charges. The UST also challenges the Debtors' $450 transportation expense (not including car payments) and $245.16 car insurance expense.  The Debtors have two cars, two teenagers and an eighth-grader.  Gasoline, maintenance, registration and licensing fees possibly could average $450 a month and car insurance premiums for a policy that covers teenage drivers could average $245.16 a month.  But, without credible evidence as how these expenses are excessive, the Court concludes they are reasonable.

The Debtors argue that the Trustee should not be able to take advantage of the Debtors' post petition good fortune in order to argue that the Debtors have sufficient disposable income to warrant dismissal under §707(b)(3).  Rather, the "totality of the circumstances" test is confined to the Debtors' financial condition as of the petition date.  The UST contends that consideration of post petition events is appropriate.  This Court has presided over cases where the UST has withdrawn its §707(b)(3) motion because the debtor, gainfully employed pre petition, has lost his employment post petition.  If that practice inures to a debtor's advantage, it is inconsistent for a debtor to argue that, when the situation is reversed, the debtor's ability to pay under §707(b)(3)(B) is limited to the facts existing as of the petition date.  The third and fourth *Green* factors consider

12

whether the debtor's proposed family budget is excessive or unreasonable and whether the debtor's schedules and statement of current income and expenses reasonably and accurately reflect the true financial condition. By reviewing the "proposed" budget and the debtor's "true financial condition" these factors suggest that post petition events are appropriately considered in applying the "totality of the circumstances" test. See, *In re Goble,* 401 B.R. 261, 276 (court may consider post petition financial situation, including "the circumstances as they existed at the time of the hearing") and cases cited therein.

### *The Debtors Do Not Have the Ability to Pay*

Discussion at one point in the June 8th hearing focused on to what extent post petition events can be considered. Whether the appropriate measure is as of petition date, the date of the filing of the §707(b) motion or as of the date of the hearing on the motion may be academic, for, the Debtors still do not produce sufficient disposable even using the UST's income figure of $10,000. [4] Even though Mr. Cutler's alleged monthly $10,000 salary (as alleged by the UST) would be included, his unemployment compensation would be eliminated, as would Mrs. Cutler's income, since, as of the date of the hearing, she was unemployed. Using the UST's estimates, the Debtors' resulting average monthly income would amount to $7455.00. The Schedule J expenses ($7708.66) remained unchanged as the Court has found no evidence that they were unreasonable or excessive. Thus, comparing income and expenses, the Debtors are

---

[4] This figure may be unrealistic as projected monthly income, as, it is based on temporary employment and may not represent "a stable source of future income", unlike the income of the debtor in *In re Goble*, 401 B.R. 261, 277 (Bankr. S.D. Ohio 2009.)

still more than $250 short each month, with no positive disposable income.[5]

It bears noting that the UST's §707(b) motion was filed in March, 2009 when Mr. Cutler was still temporarily employed. Given Mr. Cutler's sudden loss of employment in 2008 in an industry in which he had been steadily and successfully employed long term, his temporary employment as of March 2009 did not provide long term employment stability. As of March, 2009, Mr. Cutler had no assurance that his temporary employment would evolve into long term employment over at least the next 60 months. As of the June 8th hearing, Mr. Cutler had been permanently employed for less than a month. Compared with the 5 and 13 year debtor employment histories in *Goble* and *Green* (both cited by the UST), Mr. Cutler's current employment lacks the level of long-term stability which was found to be a deciding factor in favor of the UST in both of those cases. *Goble,* 401 U.S. at 277; Green, 934 F.2d at 569.

Finally, even if the Debtors did have positive disposable income, the UST must show something in addition to the Debtors' ability to pay, since the Debtors are above median income debtors who "passed" the means test. *Nockerts*, 357 B.R. at 507 (with respect to below median income debtors, "ability to pay" alone may suffice for §707(b)(3) purposes since no inquiry as to their ability to pay was conducted prior to the §707(b)(3) analysis, but something more is required for above median income debtors

---

[5] Giving the UST even a greater benefit of a doubt, there is insufficient disposable income even when Mr. Cutler's $125,000 salary is figured into the calculation. Mr. Cutler's gross monthly wage would be $10,416 ($125,00 divided by 12). Subtracting the conservative figure of $2661 for payroll deductions yields monthly income of $7755.00. Mrs. Cutler's monthly income remains at 0 as she is unemployed. The Debtors' $7755.00 monthly income and monthly expenses of $7708.66 produce a meager monthly disposable income of $46.34, or $2780.40 over 60 months. The Debtors' amended schedules reveal general unsecured debt of $135,176.83. If all $2780.40 were devoted exclusively to payment of general unsecured creditors' claims (without regard to priority claims exceeding $18,000 and ignoring secured creditors' deficiency claims), a 2% distribution would result, far less than the threshold 25% distribution which is indicative of "abuse".

who pass the means test or rebut the presumption of abuse). In response to the Court's inquiry in the June 8th hearing, the UST acknowledged that she was proceeding under §707(b)(3)(B) only on the basis of the Debtors' "ability to pay". The Court has found that the Debtors have no meaningful "ability to pay". The Debtors have been proactive in reducing their expenses and diligent in seeking jobs that pay salaries comparable to what they historically earned. They are neither intentionally underemployed nor deliberately financially overextended. Their budgeted expenses are not excessive given their circumstances, and do not include questionable self-serving expenses like repayments on loans from retirement plans. See, *In re Burton*, 379 B. R. 732 (Bankr. N. D. Ohio 2007). The UST has not alleged abuse based on lack of good faith under §707(b)(3)(A) and has not otherwise shown any other factor that demonstrates abuse under the "totality of the circumstances" of §707(b)(3)(B). Therefore, the UST's motion is denied.

###

Distribution

Gary L. Hostetler, Nicolette Mendenhall, Attorneys for the Debtors
Jeannette Eisan Hinshaw, Attorney for the UST
Case Trustee